UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

| | |
|---|---|
| THE OHIO CASUALTY INSURANCE COMPANY, | Case No.: 3: 10-CV-162-AC |
| Plaintiff, | FINDINGS AND RECOMMENDATION |
| v. | |
| FERRELL DEVELOPMENTS LLC, an Oregon limited liability company, and BILL ERICKSON HEAVY CONSTRUCTION, INC., an Oregon corporation, | |
| Defendants. | |

ACOSTA, Magistrate Judge:

*Findings and Recommendation*

      Plaintiff The Ohio Casualty Insurance Company ("Ohio Casualty") filed this declaratory

judgment action seeking a declaration from the court that Ohio Casualty has no obligation under a

commercial general liability policy to indemnify defendant Bill Erickson Heavy Construction, Inc.,

("Erickson") for amounts owed to defendant Ferrell Developments, LLC, ("Ferrell") as set out in an

arbitration award.  The court finds that only Ferrell's financing costs qualify as "property damage,"

and only damages attributable to the Ferrell's negligence claim arose from an "occurrence".

Accordingly, only the financing costs attributable to Ferrell's negligence claim are covered losses

under the term of the insurance policy.  However, all of the damages assessed against Erickson fall

within the exclusions found at J(5) and J(6) of the Policy.  Accordingly, Ohio Casualty's motion for

summary judgment should be granted.

*Background*

I.  Facts

In 2005, Ferrell was engaged in the development of real property located in Cornelius,

Oregon, to be known as the Linda Lane Development (the "Project").  (Ferrell Decl. ¶ 1.)  Ferrell

hired CSA Consulting Engineers, LLC, ("CSA")[1] to act as the project engineer and surveyor of the

Project.  (Ferrell Decl. ¶ 2.)  Ferrell then contracted with Erickson to act as general contractor tasked

with the job of constructing the transportation system and utilities on the Project.  (Ferrell Decl. ¶

2.)  The contract between Ferrell and Erickson provided that Erickson's work was to be substantially

complete by August 18, 2006.  (Brown Decl. Ex. 4 at 5.)

The transportation system required the construction roads and retaining walls, as well as a

bridge to provide access from a public roadway.  (Ferrell Decl. ¶ 4.)  The bridge was prefabricated

by Hanson Pipes and Products ("Hanson"), one of Erickson's subcontractors, in accordance with

---

[1]CSA, originally a defendant in this action, was voluntarily dismissed by Ohio Casualty on March 2, 2010.

specifications provided by CSA.  (Ferrell Decl. ¶ 4.)  When the bridge was delivered and  installed at the Project in July 2006, it became evident that the bridge was nearly two feet too tall for the improvements already completed by Erickson at the Project.  (Ferrell Decl. ¶ 4.) Erickson remedied the height discrepancy by either increasing the elevation of existing roadways or by destroying, and then rebuilding and raising, existing roadways, retaining walls, and utilities – all constructed by Erickson – to meet the height of the bridge.  (Ferrell Decl. ¶ 4, Darling Decl. ¶¶ 11-12.)  As a result, the Project was delayed, construction costs were increased, additional financing costs were incurred, and Ferrell lost the sale of at least one lot.

In August 2008, Ferrell initiated a lawsuit in state court against Erickson asserting claims for breach of contract and negligence.  (Brown Decl. Ex. 1.)  Ferrell alleged that Erickson neglected to recalculate the footings for the bridge when the type of structure was changed, resulting in the failure of the bridge to properly connect to the existing improvements.  (Brown Decl. Ex. 1 at 2.)  At the same time, Ferrell initiated arbitration proceedings against CSA to recover damages caused by the improper bridge height.  (Brown Decl. ¶ 2.)  Erickson agreed to join the arbitration and have the claims against it determined by the arbitrator.  (Brown Decl. ¶ 3.)

In the Statement of Claim signed on August 19, 2009, Ferrell represented that after the parties discovered the bridge did not connect with the roadways:

> Neither CSA nor Erickson contacted Hanson regarding the problem.  Had either done so, Hanson would have informed them that the legs of the bridge could be cut off to obtain the desired height.
>
> Rather than do this simple fix, CSA and Erickson engaged in a long and extended redesign and reconstruction of the project.

(Brown Decl. Ex. 3 at 3.)  Ferrell asserted a negligence claim against CSA and a breach of contract

claim against Erickson based on their failure to involve Hanson in determining the appropriate method of remediation. (Brown Decl. Ex. 3 at 6.) In the Claimant's Arbitration Statement dated December 1, 2009, Ferrell explained that during the construction phase of the Project, "a mistake was made in the design and construction of the bridge", that the "mistake was compounded by the failure of either CSA or Erickson to recognize that a relatively simple and quick solution to the problem was available", and that "CSA and Erickson embarked on a long and costly 'fix' that took almost a year". (Brown Decl. Ex. 4 at 1-2.) Ferrell asserted that the proper, quickest, and most economical solution would have been to merely cut off the legs of the bridge, a solution that Hanson represented was viable option. (Brown Decl. Ex. 4 at 8-10.) Ferrell mentioned a possible conversation between Erickson and Hanson employees regarding the possibility of cutting the legs off the bridge, with Erickson's project manager recalling the conversation but Hanson denying that any such conversation occurred. (Brown Decl. Ex. 4 at 8.) Ferrell based its contract claim against Erickson on failing to build a bridge or construct footings that met the specifications set forth in the contract and sought damages for additional costs paid to Erickson, the city, the county and lenders, as well as lost profits, as a result of the additional work and time necessitated by the faulty bridge. (Brown Decl. Ex. 4 at 13, 19.) Ferrell also asserted that Erickson had a special relationship with Ferrell as result of the expert advice Erickson provided with regard to the bridge design, builder, and remediation, and that Erickson failed to meet the resulting standard of care. (Brown Decl. Ex. 4 at 17-18.)

Sid Brockley ("Arbitrator") issued an Arbitration Award (the "Award") finding in favor of Ferrell and awarding $196,888 to cover the amounts billed by Erickson and CSA for the remediation efforts, the additional bond required for the redesign of the Project, and additional fees assessed by

the county. (Smith Decl. Ex. B at 2.) The Arbitrator rejected Ferrell's claim for lost sale proceeds and real estate commissions but did award Ferrell $101,080 in additional financing costs and allocated fault equally between Erickson and CSA. (Smith Decl. Ex. B at 2.) He found that "Ferrell had a 'special relationship' with both CSA and Erickson under the particular circumstances of this case" and awarded damages based on both breach of contract and negligence. (Smith Decl. Ex. B at 2.) With regard to the remediation efforts, the Arbitrator explained that:

> In retrospect, the quickest and most economical solution was to cut off the bridge legs so it would meet the already constructed roadway. CSA and Erickson conferred and investigated, and ultimately chose to retrofit the project to accomodate [sic] the bridge. This fix took longer and cost more.

(Smith Decl. Ex. B at 1.) In a Supplemental Arbitration Award ("Supplemental Award"), the Arbitrator allowed Ferrell to amend his claim to add prejudgment interest and awarded Ferrell prejudgment interest in the amount of $71,009.28 through December 15, 2009, with per diem interest of $73.16 thereafter. (Brown Decl. Ex. 5 at 1.) The Arbitrator also awarded costs relating to the arbitration, including deposition costs for transcripts introduced into evidence, against both Erickson and CSA. (Brown Decl. Ex. 5 at 2.) The General Judgment entered in state court on March 15, 2010, awarded Ferrell $148,984.00, with accrued prejudgment interest of $37,223.09 and continuing at the per diem rate of $36.58 from February 1, 2010, and costs and disbursements in the amount of $3,569.14 ("General Judgment"). (Brown Decl. ¶ 8, Ex. 6.)

## II. Policy

Ohio Casualty sold to Erickson a commercial general liability insurance policy identified as policy number BKO53187930 and covering the period from May 2, 2006, to May 2, 2007 (the "Policy"). Pursuant to the requirements of the contract between Ferrell and Erickson, Ohio Casualty

listed Ferrell as an additional insured.[2]

The Policy provides that Ohio Casualty "will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies." (Smith Decl. Ex. A at 11.) The Policy applies only where the "bodily injury" or "property damage" is caused by an "occurrence". (Smith Decl. Ex. A at 11.) "Property damage" is defined as:

> a.    Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

> b.    Loss of used of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

while "occurrence" means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions."    (Smith Decl. Ex. A at 25.)

The Policy contains a number of exclusions, some of which Ohio Casualty argues are relevant to this matter.[3] Exclusion J, entitled "Damage to Property" includes subsection (5) and (6) which exclude from coverage "property damage" to "[t]hat particular part of real property on which you or any contractors or subcontractors working directly or indirectly on your behalf are performing operations, if the 'property damage' arises out of those operations" and "[t]hat particular part of any

---

[2]Ferrell represented in its concise statement of facts that as part of the contract between it and Erickson, Erickson was required to provide insurance for its work and did so by naming Ferrell as an additional insured on the Policy.

[3]Ohio Casualty originally argued that the "your product" and "your work" exclusions also applied. However, in its reply memorandum, Ohio Casualty conceded that the "your product" exclusion is inapplicable because Erickson's "product" includes real property, and that the "your work" exclusion does not apply when damage occurs while the work is ongoing. Accordingly, these exclusions are not addressed in this Findings and Recommendation.

property that must be restored, repaired or replaced because 'your work' was incorrectly performed on it", respectively. (Smith Decl. Ex. A at 15.)  Exclusion M, entitled "Damage to Impaired Property or Property Not Physically Injured" eliminates coverage for:

> "property damage" to "impaired property" or property that has not been physically injured arising out of:
>
> (1)    A defect, deficiency, inadequacy or dangerous condition in "your product" or "your work"; or
>
> (2)    A delay or failure by you or anyone acting on your behalf to perform a contract or agreement in accordance with its terms.

(Smith Decl. Ex. A at 15.)  Finally, Exclusion N, entitled "Recall of Products, Work or Impaired Property" excludes:

> Damages claimed for any loss, cost or expense incurred by you or others for the loss of use, withdrawal, recall, inspection, repair, replacement, adjustment, removal or disposal of:
>
> (1)    "Your Product";
>
> (2)    "Your work"; or
>
> (3)    "Impaired Property"
>
> if such product, work, or property is withdrawn or recalled from the market or from use by any person or organization because of a known or suspected defect, deficiency, inadequacy or dangerous condition in it.

(Smith Decl. Ex. A at 15.)

> Policy definitions relevant to these exclusions are, in pertinent, as follows:
>
> "Impaired property" means tangible property, other than "your product" or "your work", that cannot be used or is less useful because:
>
> (a)    It incorporates "your product" or "your work" that is known or thought to be defective, deficient, inadequate or dangerous; or

(b)     You have failed to fulfill the terms of a contract or agreement;

if such property can be restored to use by:

(a)     The repair, replacement, adjustment or removal of "your product" or "your work"; or

(b)     Your fulfilling the terms of the contract or agreement.

* * *

"Your "Product":

a.     Means:

(1)     Any goods or products, other than real property, manufactured, sold, handled, distributed or disposed of by:

(a)     You;

(b)     Others trading under your name: or

(c)     A person or organization whose business or assets you have acquired; and

(2)     Containers (other than vehicles), materials, parts or equipment furnished in connection with such goods or products.

* * *

"Your Work":

a.     Means:

(1)     Work or operations performed by you or on you behalf; and

(2)     Materials, parts or equipment furnished in connection with such work or operations.

(Smith Decl. Ex. A at 23, 26.)

/ / / / /

*Legal Standard*

Summary judgment is appropriate where the " movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2010). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id*. at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In an action brought by an insurer seeking a determination by this court with regard to the insurer's obligation to indemnify its insured for damages assessed against it, this court is not bound by the factual findings made by the tribunal assessing the damages in either a judgment or award because the interests of the plaintiff and defendant are not the same in both actions. *Paxton-Mitchell Co. v. Royal Indem. Co.*, 279 Or. 607, 614 n.2 (1977). Rather, this court must look to the evidence submitted at trial to determine whether the judgment was based on a claim covered under the insurance policy at issue. *Mutual of Enumclaw Inc. Co. v. Gass*, 100 Or. App. 424, 428 (1990)(the duty to pay "depends on whether the evidence at trial shows that the judgment was entered on a

covered claim").

To determine whether the award or judgment entered against the insured is covered by the insurance policy, a court sitting in diversity must interpret the language of that policy under law of the forum state. *Home Indem. Co. v. Stimson Lumber Co.*, 229 F. Supp. 2d 1075, 1090 n.4 (D. Or. 2001). Under Oregon law, the interpretation of plain and unambiguous contract provisions is a question of law for the court. *Hoffman Constr. Co. v. Fred S. James & Co.*, 313 Or. 464, 469 (1992). However, if the language in the contact is ambiguous, evidence may be admitted to show meaning and the question becomes one of fact. *Libby Creek Lodging, Inc. v. Johnson*, 225 Or. 336, 338 (1960).

Construction of insurance contracts requires ascertaining the parties' intent. *Mcleod v. Tecorp Int'l, Ltd.*, 318 Or. 208, 215 (1993). In doing so, the terms of the contract are presumed to have been incorporated and used in their primary and general meaning. OR. REV. STAT. § 42.250. The insurer has the burden of drafting insurance policies that are clear and unambiguous. *North Pac. Ins. Co. v. Hamilton*, 332 Or. 20, 29 (2001). Therefore, any ambiguity in an insurance policy should be strictly construed against the insurer. *Hoffman*, 313 Or. at 470.

The insured has the burden of establishing that the assessed damages qualify as a covered loss under the terms of the policy. *ZRZ Realty Co. v. Beneficial Fire and Cas. Ins. Co.*, 349 Or. 117, 127 (2010). Once the insured has met this burden, the burden shifts to the insurer to show that the loss falls within the asserted exclusionary clause. *Id. See also, Employers Ins. of Wausau v. Tektronix, Inc.*, 211 Or. App. 485, 509 (2007).

/ / / / /

/ / / / /

*Discussion*

I.  Covered Losses

Ohio Casualty moves for summary judgment on its request for a declaration that it is not obligated to indemnify Erickson for the amounts awarded to Ferrell as set out in the Award.  Ohio Casualty argues that the damages awarded Ferrell under the Award are not covered by the Policy in that they do not fall within the definition of  "property damage" or that Ferrell's damages were not the result of an "occurrence" as defined by the Policy.  Alternatively, Ohio Casualty argues that the damages fall within one of four exclusions identified above and are, therefore, removed from coverage under the Policy.

A.  *"Property Damage"*

Ohio Casualty asserts that the damages assessed against Erickson by the Arbitrator, which include remediation costs to retrofit the transportation system to fit the defective bridge, including increased bond and permit costs, as well as increased financing costs caused by the delay in completion, do not fall within the Policy definition of "property damage" and are, therefore, not covered losses under the terms of the Policy.  The definition of "property damage" found in the Policy requires physical injury to tangible property or the loss of use of tangible property.  Ohio Casualty argues that the damages here result from the installation a defective component of the transportation system, not from physical injury to, or the loss of use, of tangible property.

In *Wyoming Sawmill, Inc. v. Transportation Ins. Co.*, 282 Or. 401 (1978), an insured sought insurance coverage for labor expenses incurred in removing and replacing defective studs installed in a building.  In this context, the Oregon Supreme Court construed the phrase "physical injury to tangible property" to be physical injury to the rest of the building resulting from the removal, repair

or replacement of the defective studs, but not the removal, repair, or replacement of the defective product. *Id.* at 406-07. Specifically, the court held that:

> [s]uch portion, if any of the labor expense for which claim is made as might be attributable to tearing out and putting back other parts of the building (as compared with the labor attributable to the actual removal and replacement of the studs after they have been uncovered) in order to replace the studs is within the coverage of the policy.

*Id.* at 408. Similarly, in *Milgard Mfg. Inc. v. Continental Ins. Co.*, 92 Or. App. 609 (1988), a subcontactor provided improperly tempered windows which were installed in an office building. The installation of the defective windows forced the owner of the building to make changes to the exterior design which diminished the value of the building and caused delays in the completion and occupancy of the building. *Id.* at 611. The insurer of the subcontractor rejected the tender of defense of the subsequent lawsuit filed by the owner against the subcontractor, arguing that none of the damages sought by the building owner resulted from physical injury to the office building. *Id.* at 612. The court, construing policy language similar to that found in the Policy, held that "neither the design alterations nor the alleged diminution in value come within the 'physical injury' component of the policy's coverage provision for property damage" and concluded that the insurance policy provided no coverage for the damages alleged. *Id.* at 612-13. The court did acknowledge that damages for loss of use, which were recoverable whether the tangible property was physically injured or not, fell within the definition of property damage under the coverage provisions of the policy. *Id.*

Here, the transportation system being constructed by Erickson was defective as a result of improper measurements which caused the bridge or footings to be built too tall to work with the existing roadways and utilities. Neither the bridge or the footings were removed and no physical

injury to the Linda Lane Development resulted from Erickson's removal, repair, or reinstallation of these items.  To the contrary, Erickson opted to reconstruct and alter the existing portions of the transportation system to make them compatible with the defective bridge or footings.  The changes made to the existing transportation system improvements, and the costs related thereto, are similar to the design alterations in *Milgard*, and are not within the Policy definition of "property damage." However, in accordance with *Milgard*, the court finds that damages for financial costs, which are clearly attributable to Ferrell's  loss of use of Linda Lane Development, qualify as "property damage."

Erickson argues that Ferrell primarily complained about the manner in which Erickson remedied the problem created by the defective bridge, not the defective bridge itself, and that defective product cases are not relevant to determining the issue here.  First, it is evident from Ferrell's complaint and arbitration filings that Ferrell asserted claims against Erickson both for failing to ensure that the bridge was properly constructed and in failing to remediate the problem as expeditiously and economically as possible.  Second, but for the installation of the defective bridge, Erickson would not have been faced with the need to decide the appropriate manner in which to correct the problem.  Clearly, the damages sought here are all, at least tangentially, related to the design, manufacturing, and installation of the defective bridge.  Third, Erickson has presented no authority establishing that the term "property damage" is construed differently when viewed in the context of defective product instead of defective remediation.

Erickson then argues that *Wyoming Sawmills* and *Milgard* are not applicable based on a change in the comprehensive general liability policy in 1986 with regard to the impaired property exclusion.  Erickson has not offered any legal authority tending to establish that either *Wyoming*

*Sawmills* or *Milgard* are no longer good law, despite the fact that the intervening change was made more than twenty-five years ago. Additionally, the term "impaired property" is not found in the Policy definition of "property damage", but rather an exclusion from coverage, and is not relevant in determining whether the damages at issue qualify as a covered loss under the Policy prior to consideration of possible exclusionary clauses. Finally, the implication Erickson draws from the exclusionary language, which states that the insurance does not apply to "property damages" to "impaired property" or "property that has not been physically injured" – that impaired property has to mean property that has been physically injured – is not correct. A building in which a defective elevator has been installed may qualify as "impaired" but is not physically injured until various portions of the building must be removed to replace the defective elevator or the elevator falls to the ground, damaging the basement floor and surrounding walls.

The court finds that, with the exception of damages awarded to Ferrell for additional financing costs based on loss of use of the Project while the existing roadways and utilities were reconstructed to fit the bridge, the damages assessed against Erickson are not for "property damage" as defined by the Policy. Accordingly, Ohio Casualty is not obligated to indemnify Erickson for costs related to the destruction, reconstruction, or revamping of the existing roadways and utilities.

   *B.   "Occurrence"*

The Policy provides coverage for "property damage" that is caused by an "occurrence" and defines "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." Ohio Casualty argues that the design, manufacturing, or installation of the defective bridge is not an "occurrence" as defined in the Policy.

The term "accident" is not defined in the Policy. While interpreting the term differently in

various contexts, Oregon courts have recognized that the term "accident" has a tortious connotation. *Kisle Fire v. St. Paul & Marine Ins.*, 262 Or. 1, 6-7 (1972). Consistent with this view, the courts have consistently held that damage resulting from a breach of contract is not an accident within the meaning of a commercial liability policy. *Id.* at 6 ("Damage solely caused by failure to perform a contract is not recoverable in tort."); *Oak Crest Constr. Co. v. Austin Mut. Ins. Co.*, 329 Or. 620, 626-27 (2000) (costs incurred by general contractor to remove and replace subcontractor's painting work on cabinets and woodwork was not covered under a commercial general liability policy as the damages did not arise from an "accident."); *see also California Ins. Co. v. Stimson Lumber Co.*, No Civ. 01-514-HA, 2004 WL 1173185, at *6 (D. Or. May 26, 2004). To the extent Ferrell's damages are based on its breach of contract claim, they were not the result of an "accident" and, therefore, not caused by an "occurrence" under the Policy. However, the courts also recognize that "damage caused by the negligent performance of a contract can in certain instances be recoverable in tort." *Kisle*, 262 Or. 1, 6 (*citing Dowell v. Mossberg*, 226 Or. 172, 170 (1961)).

Ferrell also asserted a claim for negligence alleging that Erickson breached a duty, independent of the contract, to ensure that all work comply with requisite codes and standards and to use its expertise to act in the best interest of Ferrell. The Arbitrator found that Ferrell had a special relationship with Erickson and that the damages suffered by Ferrell were the proximate result of both a breach of contract and negligence. Erickson has not presented any evidence with regard to the amount of damages attributable to the negligence claim.

The Arbitrator awarded damages to Ferrell and indicated that such damages were incurred as a result of both the breach of contract claim and the negligence claim. Based on this ruling, the court finds that at least a portion of the damages assessed against Erickson were caused by

Erickson's negligent conduct. However, Erickson has not presented evidence with regard to how much of the damages awarded by the Arbitrator were attributable to the breach of contract as opposed to the negligence claim. As such, Erickson has not met its burden of establishing that it suffered a covered loss under the terms of the Policy and Ohio Casualty is entitled to summary judgment on its declaratory action against Erickson.

This finding is not altered when considered in conjunction with the determination that only Ferrell's financing costs qualify as loss of use damages which fall within the Policy definition of "property damage." The Arbitrator found that the financing costs were incurred as a result of Erickson's breach of contract and negligence. Again, Erickson has not presented evidence with regard to the proper apportionment of these damages between the breach of contract and negligence claims and has, therefore, not met its burden of showing which assessed damages qualify as a covered loss under the Policy.

## II. Exclusions

Alternatively, and in the event the court found that at least some of the damages assessed against Erickson qualified as a covered loss under the terms of the Policy, Ohio Casualty argues that the damages assessed against Erickson fall within at least four of the Policy's exclusions. With the exception of Exclusion M, which Ohio Casualty asserted with regard to the loss of use damages only, the court will address each of these exclusions with the assumption that all of Ferrell's damages represent covered losses under the Policy.

### A. Exclusion J(5) - Property Damage to Real Property Upon Which the Insured is Working if the Property Damage Arises Out of Those Operations

The Policy does not cover "property damage" to the particular part of real property on which

the insured or his agents are working if the property damage arises from that work.  Erickson argues that the exclusion does not apply because the bridge was the "particular" part of real property it was working on when the damage occurred and there was no damage to the bridge.[4]  Ohio Casualty asserts that all of the work done under the contract between Ferrell and Erickson, including the construction of a working transportation system consisting of roads, embedded utilities, and retaining walls, as well as the bridge, qualify as the "particular" part real property on which the Erickson was working.

A federal district court in Washington recently addressed a similar situation and exclusionary language in *Canal Indem. Co. v. Adair Homes, Inc.*, 737 F. Supp. 2d 1294, 1302 (W.D. Wa. 2010) and found that "[t]he plain and unambiguous language of the ongoing operations exclusion bars coverage for the Pearson's property damage occurring during the construction of the residence."  In *Canal*, an insurance company sought a declaration that it was not required to indemnify it insured, a homebuilder, for claims made by a homeowner based on allegation of faulty home construction that eventually led to water intrusion, property damage and personal injury due to exposure to mold. *Id*. at 1296.  The homeowner asserted that defective caulking and improper installation of windows, weather sheathing and siding allowed water to infiltrate the home and resulted in the growth of mold and mildew.  *Id*. at 1297.  The court acknowledged that "Washington courts have interpreted the language of an ongoing operations exclusion to apply to the insureds' entire operations."  *Id*. at 1301. The court did not limit the exclusion to the "particular" property which caused the damage, allegedly the windows, sheathing, and siding, but excluded all of the property covered by the construction

---

[4]Erickson concedes that the damaged property, ie the roadways, utilities and retaining walls, is real property and that the work was ongoing, in its arguments against the application of Exclusions K and L.

project.

Similarly, a judge in this district found that exclusionary language virtually identical to that currently before the court eliminated insurance coverage for the lost value of a well resulting from damage to a screen installed by the insured in *Schneider Equip. Inc. v. Travelers Indem. Co. of Illinois*, Civil No. 04-1482-HA, 2006 WL 2850465 (D. Or. Sept. 29, 2006). The insured was hired to rehabilitate an existing well by drilling a hole and installing a screen assembly. *Id*. at *1. The insured damaged the newly installed screen during the testing of the well, leaving the well unusable. *Id*. The well owner sued the insured for loss of the well, the cost of building a new well, and the cost of purchasing water to replace the water obtained from the well. *Id*. at *2. The insured tender defense of the action to the insurer, who denied coverage. *Id*.

On summary judgment, the court addressed the question of whether the damages were excluded under policy language substantially similar to that currently before the court. Initially, the court determined that the term "that particular part of the property" was ambiguous in that it could be construed to mean only the screen the insured was installing at the end of the well or encompass the entire well and denied the insurer's motion for summary judgment. *Schneider Equip. Inc. v. Travelers Indem. Co. of Illinois*, Civil No. 04-1482-HA, 2005 WL 1565006, at *6 (D. Or. June 29, 2005). However, the insurer subsequently filed a renewed motion for summary judgment, which the court granted and found the damage to the well fell within the exclusionary language. *Schneider*, 2005 WL 2850465, at *4. The court specifically found that the damage to the well was isolated to the area where the insured installed the screen, and then held that the exclusionary language precluded coverage for damages sought as the "loss of use of the well was wholly a result of plaintiff's defective work." *Id*. at *5.

It is clear from these cases that, at least in Oregon and Washington, the term "particular" property is not limited to the specific item the insured is working on at the time of the damage but is more broadly construed to include the property affected by the services performed by the insured. This construction of the Policy language is consistent with the general understanding that while general commercial liability policies are designed to indemnify an insured against liability due to be paid to others for harm caused by the insured, they are not intended to insure all business risks. The Oregon Supreme Court recognized this limitation in *Oak Crest*, stating that:

> The insured, as a source of goods or services, may be liable as a matter of contract law to make good on products or work which is defective or otherwise unsuitable because it is lacking in some capacity. This may even extend to an obligation to completely replace or rebuild the deficient product or work, This liability, however, is not what the coverages in question are designed to protect against. The coverage is for tort liability for physical damages to others and not for contractual liability of the insured for economic loss because the product or completed work is not that for which the damaged person bargained.

*Oak Crest*, 329 Or. at 628 n.7 (quoting Roger C. Henderson, *Insurance Protection for Products Liability and Completed Operations – What Every Lawyer Should Know*, 50 Neb. L. Rev. 415, 441 (1971)).

Erickson argues that the Missouri case of *Columbia Mutual Ins. Co. v. Shauf*, 967 S.W.2d 74 (Mo. 1998) requires a stricter construction of the term "particular part" and limits the application of the exclusion to damages related solely to the bridge, the particular part of the Property Erickson was working on when it discovered the defect. It is true that the Missouri state court, as did Judge Hagggerty in *Schneider*, found the term to be ambiguous and, as a result, applied the more narrow of the two interpretations. *Schauf*, 967 S.W.2d at 80-81. However, even under this more narrow approach, the court construed the exclusion to apply to "'property *on* which the insured is performing

operations,' not to the area *in* which the insured is performing operations." *Id*. at 81.  Applying this interpretation to the facts before it, the court limited the exclusion to the kitchen cabinets on which the insured was hired to paint but not the other portions of the house damaged by the fire started by the insured while cleaning his equipment in the living room.  *Id*. at 76.

The court finds this interpretation and application to be similar to those found in *Canal* and *Schneider*.  The court did not limit the exclusion solely to the specific item being worked on by the insured at the time of the fire, which was his painting equipment.   Rather, the court found that the exclusion applied to the kitchen cabinets, which were "the particular part of the real property that was the subject of Shauf's operations at the time of the damage." *Id*. at 81.  This is consistent with the  interpretation by the Washington courts that the exclusion should be read to include the insureds' entire operation and the finding by Judge Haggerty that the exclusion applied to the loss of use of a well even though the damage occurred only to the cite of the newly installed screen.

Erickson was obligated under the contract to build a usable transportation system on the Property.  The bridge was a part of the system.  Erickson was continuing work on that system when it installed the defective bridge, which then made the roadways, utilities, and retaining walls already in place defective and useless as well.  The unambiguous language of Exclusion J(5) bars coverage for damages arising out of the work to be performed by Erickson on the Property.  Accordingly, Ohio Casualty is entitled to summary judgment and a declaration that it is not obligated to indemnify Erickson for the damages assessed against it by the Arbitrator in the Award.

> B.  *Exclusion J(6) - Property Damage to Property That Must be Restored, Repaired, or Replaced Due to Incorrectly Performed Work by the Insurer*

Erickson again argues that the "particular" part of any property should be limited to the

bridge. For the reasons discussed above, the court rejects this argument and finds that this exclusion

bars coverage for the damages awarded to Ferrell by the Arbitrator in the Award as well.

### C. Exclusion M - Damage to Impaired Property or Property Not Physically Injured

Ohio Casualty argues that Ferrell's financing costs are excluded under the Policy as damage

arising out of a defective product or delay in performing a contract. Based on the findings that the

Property did not suffer physical injury and that only Ferrell's financing costs qualify as "property

damage", the relevant portion of exclusion M excludes coverage if the financing costs arise out of

a "defect, deficiency or inadequacy" in Erickson's product or work, or out of a "delay or failure" by

Erickson to perform according the contract terms. Again, this court follows the lead of *Milgard* and

finds that loss of use damages resulting from delays caused by the installation of a defective product

fall with this exclusionary language.[5]

Erickson argues that Ohio Casualty misunderstands Ferrell's case, that the Property suffered

physical damage as a result of the incorporation of the defective bridge, and that *Wyoming Sawmills*

requires a finding that the tearing out and destroying of other, perfectly good work, constitutes

physical injury to tangible property. The first two arguments have already been addressed. With

---

[5]The exclusionary language considered in *Milgard* provided that coverage did not apply to:

the lost of use of tangible property which has not been physically injured or destroyed resulting from

> (1) a delay in or lack of performance by or on behalf of the named insured of any contract or agreement, or

> (2) the failure of the named insured's products or work performed by or on behalf of the named insured to meet the level of performance, quality, fitness or durability warranted or represented by the named insured.

regard to *Wyoming Sawmills*, the opinion held that "labor attributable to the repair of damage to the balance of the building necessitated in getting to the studs in order to replace them would be labor expended for the repair of physical damage to the building caused by plaintiff's defective product." *Wyoming Sawmills*, 282 Or. at 407.  This does not translate to a holding that costs incurred to successfully incorporate the defective product into the existing improvements would also be considered costs expended for the repair of physical damage caused by the defective bridge. Furthermore, *Wyoming Sawmill* clearly holds that any expenses related to the removal, repair, or replacement of the defective product is not covered "property damage".  To the extent the existing roads, utilities, and retaining walls were part of the transportation system which Erickson was responsible for, any costs attributed to the removal, repair, or replacement of these items would be viewed as costs related to the repair of the defective transportation system, and not other parts of the project.

Finally, Erickson argues that the financing costs did not solely "arise" out of the defect or delay but also, at least to some degree, out of Erickson's allegedly poor choice of remediation options.  This is a distinction without a difference.  Whether the delay of performance was caused by the defective bridge or the decision on how to incorporate the defective bridge to the existing transportation system, it still delayed Erickson's performance of the contract, which was to be substantially completed by August 18, 2006, and caused Ferrell to incur the additional financing costs.

### D.  Exclusion N - Damage to Property Withdrawn or Recalled from Market or Use

The Policy excludes from coverage damages caused by the withdrawal or recall of product, work, or property.  Erickson argues that this exclusion requires the product to be recalled.  Because

the bridge was not recalled, this exclusion is not applicable.  Ohio Casualty contends that the language should construed to include products withdrawn from use by the insured in addition to being recalled from the market.

Judge Haggerty of this court previously addressed this issue and, following the interpretation of the exclusion by the Oregon Supreme Court in *Wyoming Sawmill*, supra, held that the exclusion did not apply if the product was not subject to a commercial withdrawal or recall.  *California Ins. Co. v. Stimson Lumber Co.,* No Civ. 01-514-HA, 2004 WL 1173185, at *8 (D. Or. May 26, 2004). The court finds no reason to depart from the reasoning of the Oregon Supreme Court or to disagree with Judge Haggerty's application of that cases rule on this issue.  Exclusion N does not apply to the facts currently before the court.

III.  Costs Assessed in General Judgment

The Policy provides that Ohio Casualty will pay, with respect to any suit against an insured it defends, all costs taxed against the insured in the suit.  Erickson argues that because Ohio Casualty defended it in the underlying litigation and the court awarded costs in the amount of $3,569.14 in the General Judgment, Ohio Casualty must indemnify Erickson for those costs. Ohio Casualty acknowledges that the state court awarded costs in the General Judgment.  However, it argues that in this action it is seeking a declaration that it does not owe the amounts assessed by the Arbitrator in the Award, the costs awarded in the General Judgment are not relevant to its claim, and neither defendant has asserted a counterclaim for the costs.

The court agrees with Ohio Casualty – only the damages awarded by the Arbitrator in the Award are properly before the court.  The issue of whether Ohio Casualty is obligated under the terms of the Policy to indemnify Erickson for costs assessed in the General Judgment were not put

at issue by Ohio Casualty in the complaint and were not raised by either Erickson or Ferrell in a counterclaim.[6]  Consequently, the court need not, and will not, address Ohio Casualty's obligations in this regard.

## V.  Ferrell as an Additional Insured

Ferrell appears to join in the opposition filed by Erickson and then makes the additional argument that as an additional insured, Ohio Casualty is required by the terms of its policy to pay Ferrell its damages caused by Erickson's negligent work.   The addition of Ferrell as an additional insured does not alter Ohio Casualty's obligations under the Policy.   Only Erickson's liability to Ferrell is at issue here – no allegations or issues regarding Ferrell's liability and subsequent right to protection under the Policy have been presented.  Ohio Casualty is merely obligated to indemnify Erickson for any losses covered by the Policy, and any claim of Ferrell against the Policy is subject to the same restrictions and exclusions as Erickson's claim.   Accordingly, the discussion and suggested recommendations set forth above are equally applicable to Ferrell and its claims.

*Conclusion*

Ohio Casualty's motion (#35) for summary judgment should be GRANTED and a judgment declaring that Ohio Casualty is not obligated under the Policy to indemnify Erickson for the damages

/ / / /

---

[6]Ohio Casualty represented at oral argument that it assumed that the General Judgment was at issue and moved to amend its answer to assert a counterclaim for costs assessed in the General Judgment.  In light of the advanced stage of this declaratory judgment action – summary judgment motion fully briefed and oral argument concluded – and the fact that Ohio Casualty's answer refers only to the arbitration award and damages related thereto, and does not reference the General Judgment, the court finds that Ohio Casualty's oral motion to amend should be denied.  This does not preclude Ohio Casualty from filing a separate action to enforce the General Judgment with regard to the award of costs.

assessed against it by the Arbitrator in the Award should be entered.  Erickson's oral motion to

amend its answer, made during oral argument, should be DENIED.

<u>Scheduling Order</u>

The Findings and Recommendation will be referred to a district judge for review. Objections, if any, are due **August 11, 2011**, if no objections are filed, then the Findings and Recommendation will go under advisement on that date.

If objections are filed, then a response is due within 14 days after being served with a copy of the objections.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED this 27th of July, 2011

_____
/s/ John V. Acosta
JOHN V. ACOSTA
United States Magistrate Judge